**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SUFFOLK FEDERAL CREDIT UNION,

        Plaintiff,

    -against-

CUMIS INSURANCE SOCIETY, INC.,

        Defendant.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
10-CV-0001 (ADS)(ETB)

<u>**APPEARANCES:**</u>

**Frankfurt Kurnit Klein & Selz, P.C.**
*Attorneys for the Plaintiff*
488 Madison Avenue, 9th Floor
New York, N.Y. 10022
   By: Amelia Katherine Seewann, Esq.
      Jeremy Seth Goldman, Esq.
      Jessie F. Beeber, Esq.
      Patrick J. Boyle, Esq., Of Counsel

**Sedgwick Detert Moran & Arnold LLP**
*Attorneys for the Defendant*
125 Broad Street
New York, N.Y. 10004
   By: Arthur Aizley, Esq.
      Brian Maurice Oubre, Esq., Of Counsel

**SPATT, District Judge.**

This is an insurance coverage action in which Plaintiff Suffolk Federal Credit Union ("Suffolk") alleges that Defendant CUMIS Insurance Society, Inc. ("CUMIS") breached the terms of the parties' fidelity bond (the "Bond") by refusing to indemnify Suffolk for losses arising from a fraud committed by Suffolk's loan servicer, CU National Mortgage, LLC ("CU National").

A number of motions are pending before the Court. First, Suffolk moves to amend its Complaint to add a claim against CUMIS for its alleged bad faith denial of coverage and to allege a claim for its attorneys' fees based upon CUMIS's reliance upon arguments concerning its coverage obligations that Suffolk argues are unreasonable.

Second, CUMIS moves for summary judgment or, in the alternative, partial summary judgment, on the grounds that (1) Suffolk is not entitled to coverage under the "Employee or Director Dishonesty" coverage of the bond, because CU National was not an employee of Suffolk when it committed the alleged fraudulent acts; (2) Suffolk is not entitled to coverage under the "Forgery and Alteration" coverage of the bond, because no forgery or alteration occurred; (3) Suffolk is not entitled to coverage under the Bond because a reasonable credit union would have discovered its losses before the inception of the Bond Period; (4) Suffolk's losses constitute a "single loss" under the Bond and are therefore limited by the $10 million single loss limit of liability, subject to a $25,000 deductible; (5) in the event the single loss limit of liability does not apply, Suffolk's loss should be calculated by taking the principal amount of the subject loans, and deducting from that amount all monies received on those loans; (6) Suffolk is not entitled to unearned interest under the bond; and (7) Suffolk is not entitled to attorneys' fees.

Third, Suffolk moves for partial summary judgment on the issue of liability on its claims of breach of contract and declaratory relief and for an immediate trial on the amount of damages to be awarded against CUMIS.

Fourth, Suffolk submits a second motion for partial summary judgment on the grounds that (1) Suffolk's losses in this matter are not a single loss within the meaning of the Bond or the expectation of the parties; (2) the reduction of Suffolk's loss from the Fannie Mae Settlement

should not "include accrued interest" amounts paid into escrow after the loss was discovered and while the ownership of the loans was in dispute, because those payments are wholly unrelated to Suffolk's loss and CUMIS's obligations under the bond; (3) Suffolk is entitled to set-off from the Fannie Mae recovery the amount of attorneys' fees it incurred to obtain its settlement from Fannie Mae; (4) Suffolk's loss should not be reduced by $4,879,945 because Suffolk reduced the principal balance on each loan, and thus the amount of the claimed loss, by applying every payment received from CU National until those payments stopped in 2009; (5) Suffolk is entitled to pre-judgment interest on its claims; and (6) Suffolk is entitled to its reasonable attorneys' fees.

Lastly, CUMIS moves to strike Suffolk's second motion for partial summary judgment, while Suffolk moves to strike  CUMIS's May 23, 2012 and June 22, 2012 Rule 56.1 statements.

For the reasons set forth below, the Court (1) denies CUMIS's motion to strike Suffolk's second motion for partial summary judgment; (2) denies Suffolk's motion to strike CUMIS's May 23, 2012 and June 22, 2012 Rule 56.1 statements; (3) denies Suffolk's motion to amend its complaint; (4) denies Suffolk's motions for partial summary judgment; and (5) denies in part and grants in part CUMIS's motions for summary judgment.

# I.  BACKGROUND

## A.  Factual Background

### 1. The Fraudulent Scheme Committed Against Suffolk

CU National was a New Jersey Limited Liability Corporation, and a subsidiary of U.S. Mortgage Corporation ("U.S. Mortgage").  Both CU National and U.S. Mortgage were headquartered in Pine Brook, New Jersey.  Michael McGrath ("McGrath") served as CU National's President and Chief Executive Officer and was also the President, Chief Executive Officer and major shareholder of U.S. Mortgage.

3

On or about February 1, 2003, Suffolk and CU National entered into a "Mortgage Services Agreement ("the Agreement") whereby CU National agreed to perform various services in connection with Suffolk's residential mortgage business.   In this regard, CU National assumed the following duties:  "(1) collecting mortgage payments from borrowers and remitting the payments to Suffolk; (2) reporting to Suffolk regarding the mortgages; (3) remitting tax and insurance payments to appropriate entities from the borrower payments; (4) providing monthly statements to borrowers; (5) ensuring that the mortgages complied with statutory and regulatory requirements; (6) reporting mortgage information to the appropriate regulatory entities on a periodic basis; (7) maintaining all necessary and appropriate documentation for mortgage payments, balances and activity; (8) commencing mortgage collection and enforcement proceedings against borrowers as necessary; and (9) managing and maintaining real property acquired by Suffolk in foreclosure."   (Dkt No. 84, pg. 3.)  In addition, CU National also facilitated the sale to the secondary market of certain mortgage loans that Suffolk no longer wished to keep in its portfolio.

For approximately five years, from 2004 until January 2009, McGrath directed a fraudulent scheme in which he and others at CU National and U.S. Mortgages sold 189 of Suffolk's mortgage loans ("the subject loans") to the Federal National Mortgage Association ("Fannie Mae") without Suffolk's knowledge or authorization and then pocketed the proceeds. These loans were worth more than $42 million.

The fraudulent scheme was committed in the following manner.  First, McGrath or one of his employees would select a loan that Suffolk had not authorized CU National to sell.  Second, they would prepare an Allonge and Assignment which they used to assign the loan from Suffolk to U.S. Mortgage, which was an authorized loan seller to Fannie Mae.  On the Allonge and

Assignment, McGrath or one of his employees would sign their own names, but falsely represent that they were a Suffolk "AVP" or employee. Third, after completing the assignment of the loan from Suffolk to U.S. Mortgage, McGrath or one of his employees would execute a separate Allonge and Assignment in order to assign the loan from U.S. Mortgage to Fannie Mae. Fourth, McGrath or one of his employees would submit the underlying promissory note and the fabricated Allonge and Assignment to Fannie Mae, thereby accomplishing the sale of the loan to Fannie Mae. Lastly, instead of forwarding the proceeds from the sale of the loan to Suffolk, McGrath kept the money and used it for himself and his companies without Suffolk's knowledge or authorization.

To conceal the fraud, CU National continued to service Suffolk's loans, including those that had been sold without authorization. Thus, CU National prepared monthly trial balance reports for Suffolk, which listed the loans that were currently in Suffolk's portfolio and being serviced by CU National. Some of these trial balance reports falsely indicated that the subject loans were still in Suffolk's portfolio, even though they had been sold to Fannie Mae. For example, the monthly trial balance report submitted at the end of December 2008 indicated that CU National was servicing 599 loans in Suffolk's portfolio, when, in fact, 189 of these loans had already been sold to Fannie Mae. CU National also continued to send Suffolk monthly principal and interest payments for the subject loans after they had been sold to Fannie Mae, again in an effort to make it seem as if those loans were still in Suffolk's portfolio.

Suffolk neither recorded nor kept track of those loans it authorized for sale. Rather, Suffolk relied upon CU National to monitor those loans that Suffolk wished to sell. To that end, CU National prepared monthly pending sales reports, which listed the loans that U.S. Mortgage would be selling on behalf of Suffolk.

However, although the trial balance reports and the pending sales reports were designed to conceal the fraud, discrepancies existed within some of these reports that may have indicated that the subject loans were missing from Suffolk's portfolio. For example, the monthly trial balance reports from August 2005 to April 2006 do not list 44 of the subject loans, but these loans are then listed in the May 2006 monthly trial balance report. In addition, CU National was often late in providing Suffolk with monthly remittances and monthly service reports, thus creating problems for Suffolk when it tried to properly close its books each month. Also, U.S. Mortgage frequently delayed in remitting the proceeds from those loans CU National was authorized to sell; these delays lasted between 30 days to up to one year.

According to Suffolk, it closely monitored monthly principal and interest payments and would often notify CU National if payments were received late. However, CUMIS contends that Suffolk did not review either the monthly trial balance reports or the monthly pending sales reports. CUMIS further asserts that Suffolk did not audit CU National or U.S. Mortgage, even though it was required to obtain an SAS-70, which is an independent audit of the internal controls of third-party vendors. Lastly, CUMIS alleges that when Suffolk's Executive Vice President John Klag tried to investigate U.S. Mortgage's delays in remitting the proceeds for the authorized sales, McGrath complained and Suffolk subsequently fired Klag.

In January 2009, the United States Attorney's Office informed Suffolk that CU National had sold Suffolk loans to Fannie Mae without Suffolk's authorization. Suffolk claims that this is when it first discovered McGrath's fraudulent scheme. However CUMIS disputes this and argues that Suffolk was aware of facts that would have made a reasonable person assume that a loss had occurred prior to January 2009.

On June 11, 2009, in the United States District Court for the District of New Jersey, McGrath pled guilty to one count of mail and wire fraud conspiracy in violation of 18 U.S.C. § 1349 and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h).

**2. The Fidelity Bond**

In 2008, Suffolk purchased the Bond from CUMIS.  The Bond was effective from April 1, 2008 until April 1, 2009 and protected Suffolk against all "covered losses" discovered during that period.  At issue in this case is the coverage provided under (1) Coverage A, Employee or Director Dishonesty and (2) Coverage S, Forgery and Alteration.  Also at issue are the Bond's terms with respect to its "Singe Loss Limit of Liability and "Discovery of Loss" conditions.

Under Coverage A, Employee or Director Dishonesty, the Bond provides in relevant part:

> We will pay you for your loss resulting directly from dishonest acts committed by an "employee" or "director," acting alone or in collusion with others.
>
> Such dishonest acts must be committed by the "employee" or "director" with the intent to:
>
> a. Cause you to sustain such loss; or
> b. Obtain an improper financial benefit for the "employee," director," or for any other person or entity.
>
> However, if some or all of your loss resulted directly or indirectly from a "loan" or "trade," that portion of the loss is not covered unless you establish that the portion of the loss involving a "loan" or "trade" resulted directly from dishonest acts committed by the "employee" or "director," acting alone or in collusion with others, with the intent to:
>
> 1) Cause you to sustain a loss; and
> 2) Obtain an improper financial benefit for the "employee" or "director," or a financial benefit for any other person or entity.

(Dkt. No. 83-1, pg. 25.)

7

The bond explicitly excludes from its definition of "employee" "independent contractors" and "agents, meaning persons authorized by you to act for you." (Dkt. No. 83-1, pg. 44.) However, the Bond's definition of "employee" does include, for the purposes of Coverage A, "servicing contractors." Specifically, the Bond states that "[a]ll persons employed by any 'servicing contractor,' including its partners, officers and employees, will collectively be considered one 'employee' for all purposes of this Bond, except for the Termination Or Limitation Of Coverage For Employee Or Director Condition." (Dkt. No. 83-1, pg. 44.) In turn, the bond defines "serving contractor" as follows:

> Any person or entity duly authorized by you to perform any of the following services and only while performing such services:
>
> a. Collect and record payments on real estate mortgage or home improvement loans;
> b. Establish tax or insurance escrow accounts on real estate mortgage or home improvement loans, made, held or assigned by you; or
> c. Manage real property owned by you or under your supervision and control.
>
> "Servicing contractor" includes the partners, officers and employees of entities duly authorized by you to perform any of the above services.

(Dkt. No. 83-1, pg. 51-52.)

Under Coverage S, Forgery or Alteration, the Bond provides:

> We will pay you for your loss resulting directly from the "forgery" or alteration of an "instrument."

(Dkt. No. 83-1, pg. 34.) "Forgery" is defined under the bond as "affixing the handwritten signature, or a reproduction of the handwritten signature, of another natural person without authorization or ratification, and with the intent to deceive." (Dkt. No. 83-1, pg. 47.) The Bond does not provide a definition for "alteration." Moreover, the Bond states that "a signature that

8

consists in whole or in part of one's own name signed with or without authority, in any capacity

for any purpose, is not a 'forgery.'" (Dkt. No. 83-1, pg. 48.) In addition, under the Bond

> "Instrument" means an original: mortgage, "document of title," deed, contract for deed, deed of trust, promissory note, "security agreement," money order, certificate of deposit, "certificated securities," bond coupon, interim receipt for a security, assignment of mortgage, check, draft, share draft, bill of exchange, "withdrawal order," "letter of credit," "acceptance," passbook held as collateral, or "certificate of origin or title."
>
> "Instrument" also means a written instruction to the insurer of an "uncertificated security" requesting that the transfer, pledge, or release from pledge, of the "uncertificated security" specified, be registered.

(Dkt No. 83-1, pg. 48.)

The "Single Loss Limit of Liability" condition states that "the maximum amount

[CUMIS] will be liable to pay for a 'single loss' is the Single Loss Limit of Liability for

Consumer Legislation shown on the Declarations in effect when such 'single loss is

discovered.'" "Single loss" is defined, in pertinent part, as

> all loss covered under [the] Bond resulting from:
>
> a. Any one act or omission, or series of related acts and/or omissions, on the part of any person or persons (whether "employee(s)," "director(s)," or not), whenever occurring; or
> b. All acts and omissions, whether related or not, on the part of any person (whether an "employee," "director," or not), or in which such person is concerned or implicated, whenever occurring[.]

(Dkt. No. 83-1, pg. 52.) Under the Declarations, the single loss limit of liability for Coverage A

is $10 million, subject to a single loss deductible of $25,000. The single loss limit of liability for

Coverage S is $1 million, subject to a $10,000 single loss deductible.

Lastly, the "Discovery of Loss" condition states, in relevant part:

> This Bond applies to loss discovered by you while this Bond is in
> effect.  Discovery occurs when you first become aware of facts
> which would cause a reasonable person to assume that a loss of a
> type covered under this bond has been or will be incurred,
> regardless of when the act or acts causing or contributing to such
> loss occurred.  The exact amount or details of loss may not be
> known at the time of discovery.

(Dkt. No. 83-1, pg. 71.)  Under the Bond, Suffolk was required to send CUMIS "written notice at

the earliest practicable moment after Discovery of Loss, but not to exceed 60 days after such

discovery, without regard to amount or whether the loss appears to exceed any deductible."

(Dkt. No. 83-1, pg. 71.)

## B.  Procedural Background

Suffolk filed a Notice of Loss with CUMIS on February 24, 2009 to recover losses

related to the fraud orchestrated by McGrath.  Approximately twenty-five other credit unions

who were defrauded by McGrath in a similar manner as Suffolk also filed claims with CUMIS

from late 2009 to early March 2009.  However, CUMIS declined to cover Suffolk's losses,

because it did not believe they were covered under the Bond.

On January 4, 2010, Suffolk commenced the instant action against CUMIS by filing the

Complaint.  The essence of Suffolk's claims is that CUMIS breached the terms of the parties'

contract by refusing to indemnify Suffolk for losses arising from a fraud committed by CU

National.   However, on April 11, 2012, the Plaintiff moved to amend its Complaint to include a

claim of bad faith denial of coverage, even though (1) discovery, expert witness disclosures and

expert witness depositions had already been completed and (2) the parties were preparing to

move for summary judgment.

## II. CUMIS'S MOTION TO STRIKE SUFFOLK'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUFFOLK'S MOTION TO STRIKE CUMIS'S RULE 56.1 STATEMENTS

CUMIS argues that the Court should strike Suffolk's second motion for partial summary judgment. In that motion, Suffolk addresses the same issues that CUMIS raises in its own motion for summary judgment. According to CUMIS, Suffolk's motion should be rejected because it was filed late, raises issues not previously disclosed at the pre-motion conference and was filed without supporting papers.

However, "this Court has discretion to consider documents filed in violation of procedural rules." Pagan v. Abbott Labs., Inc., 10-CV-4676(ADS)(WDW), 2012 U.S. Dist. LEXIS 159273, at *9 (E.D.N.Y. Oct. 20, 2012) (citation omitted); Church & Dwight Co. v. Kaloti Enters. of Mich., L.L.C., 07 Civ. 0612 (BMC), 2011 U.S. Dist. LEXIS 110955, at *6 n. 1 (E.D.N.Y. Sept. 27, 2011) (citation and internal quotation marks omitted). Furthermore, "[t]he grant of summary judgment for the nonmoving party clearly is proper if both sides agree that there are no material fact issues." Jackson v. Nassau County Bd. Of Sup'rs, 818 F. Supp. 509, 535 (E.D.N.Y. 1993). See also Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.")

Here, Suffolk's second motion for partial summary judgment simply addresses issues that were already raised by CUMIS in its motion for summary judgment. See Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991) ("[T]he threat of procedural prejudice is greatly diminished if the court's *sua sponte* determination is based on issues identical to those raised by the moving party."). In addition, CUMIS had an opportunity to reply to Suffolk's arguments, which Suffolk raised in its opposition to CUMIS's motion for summary

judgment, and did so.  See Bridgeway Corp. v. Citibank, 201 F.3d 134, 140 (2d Cir. 2000).

Accordingly, exercising its discretion, the Court will consider Suffolk's second motion for partial

summary judgment.

The Court also denies Suffolk's motion to strike CUMIS's May 23, 2012 and June 22,

2012 Rule 56.1 statements.  Although Suffolk contends that it has been unfairly prejudiced by

CUMIS's submissions and that these new filings "confuse the record of what the facts are," (Dkt.

No. 92, pg. 2), the Court finds that CUMIS's May 23, 2012 and June 22, 2012 Rule 56.1

statements contain immaterial deviations from the Rule 56.1 Statements CUMIS filed on January

17, 2012 and March 19, 2012.  In any event, Suffolk has had an opportunity to respond to these

new filings in its response to CUMIS's 56.1 statements and in its reply brief in further support of

its first motion for partial summary judgment.  As such, the Court will consider CUMIS's May

23, 2012 and June 22, 2012 Rule 56.1 statements.  See McAnaney v. Astoria Fin. Corp., No 04-

CV-1101 (JFB) (WDW), 2007 U.S. Dist. LEXIS 67552, 4-5 n. 1 (E.D.N.Y. Sept. 12, 2007)

(holding that "Rule 56.1 does not prohibit the consideration of untimely statements, at least

where the admission of the statement will not prejudice an opposing party" and that "acceptance

of defendants' amended 56.1 filings will not unfairly prejudice plaintiffs" where "they have had

an opportunity to respond to the assertions therein") (citation and internal quotation marks

omitted) (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.2001) ("A district court

has broad discretion to determine whether to overlook a party's failure to comply with local

court rules.")).

### III. THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

## A. Legal Standard

It is well-established that, when deciding a motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c), the Court may not grant such a motion unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Paone v. Microsoft Corp., 07-cv-2973 (ADS)(ARL), 2012 U.S. Dist. LEXIS 105990, at *14 (E.D.N.Y. July 30, 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence

favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249–50 (internal citations omitted).

## B.  Choice of Law

"In diversity jurisdiction cases, federal courts 'must look to the choice of law rules of the forum state.'"  Deutsch v. Novartis Pharms. Corp., 723 F. Supp. 2d 521 (E.D.N.Y. 2010) (citing Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)).  "In New York 'the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.'"  Id.

In this case, both the Plaintiff and the Defendant agree that New York law applies.  Thus, "no choice of law analysis is necessary" and the Court applies New York law.  Fed. Ins. Co. V. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011) (citation omitted).

## C. As to Whether Suffolk's Losses are Covered Under Coverage A, Employee or Director Dishonesty

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract."  Fed. Ins. Co., 639 F.3d at 567 (citation omitted).   Thus, courts "give unambiguous provisions of an insurance contract their plain and ordinary meaning" and will not "disregard the plain meaning of the policy's language in order to find an ambiguity where none exists."  Id.  (citation and internal question marks and alterations omitted).   "On the other hand, under New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase."  Id.  "However, where language in a contract is ambiguous, summary judgment can be granted if the non-moving party fails to point to any

relevant extrinsic evidence supporting that party's interpretation of the language." Id. (citation and internal quotation marks omitted).

"The question of whether the language of a contract is clear or ambiguous is one of law, and therefore must be decided by the court." Id. at 568 (citation and internal quotation marks omitted). In cases involving insurance contracts, "[l]anguage . . . will be deemed ambiguous if reasonable minds could differ as to its meaning." Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998); see also Fed. Ins. Co., 639 F.3d at 567. Moreover "in New York, when an insurer seeks to disclaim liability through an exclusion clause in the policy the insurer must prove that the insured clearly is not covered by the policy. Any ambiguities are to be resolved in favor of the insured." Broadway Nat'l Bank v. Progressive Casualty Ins. Co., 775 F. Supp. 123, 128 (S.D.N.Y. 1991) (citing Marino v. New York Telephone Co., 7631 944 F.2d 109 (2d Cir. 1991)). See also Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 615 (2d Cir. 2001).

In this case, Suffolk argues that McGrath and his employees fall within the Bond's definition of "employee" for the purposes of Coverage A, because CU National was a servicing contractor and Coverage A's definition of "employee" includes "servicing contractors." Conversely, CUMIS asserts that the Bond's definition of "servicing contractors" limits the extension of coverage under Coverage A to servicing contractors only while they are performing the three traditional loan servicing functions listed in the Bond. Therefore, according to CUMIS, since CU National was not acting in its capacity as a servicing contractor when it sold the subject loans to Fannie Mae, the losses that Suffolk incurred as a result of the fraud are not covered under Coverage A.

Suffolk relies on the recent decision of the United States District Court of the District of New Jersey's (Debevoise, J.) in Sperry Assocs. Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.,

Civ. No. 10-00029 (DRD), 2012 U.S. Dist. LEXIS 26839 (D.N.J. Mar. 1, 2012), to support its position. The Sperry action involved another credit union that had suffered losses due to the CU National fraud and had a similar fidelity bond from CUMIS. The court in that case, applying New York law, granted summary judgment in favor of the credit union. In reaching its decision, the court held that "CUMIS's argument" that the definition of "servicing contractor" excluded coverage under Coverage A for CU National's fraud was "unavailing because it ignores that the dishonesty was within the scope of a performed duty: but for the covered activity of collecting and recording loans, the fraud could not have been originated, perpetrated, nor concealed." Id. at 26. The Court thus reasoned that "the Bond-covered activity of collecting and recording was integral to the origination, perpetuation, and concealment of the fraudulent scheme." Id. at *28.

However, this Court must respectfully disagree with the Sperry Court's holding, since it finds that the language of the Bond unambiguously excludes coverage for those dishonest acts committed by servicing contractors outside the scope of the enumerated duties listed under the definition of "servicing contractor." The definition of "servicing contractor" specifically states that a third party vendor is a servicing contractor under the Bond "only while performing" the services of (1) "collect[ing] and record[ing] payments on real estate mortgage or home improvement loans"; (2) "establish[ing] tax or insurance escrow accounts on real estate mortgage or home improvement loans, made, held or assigned by [Suffolk]"; or (3) "manag[ing] real property owned by [Suffolk] or under [Suffolk's] supervision and control." (Dkt. No. 83-1, pg. 51-52.) Despite Suffolk's arguments and the Sperry Court's holding, this Court declines to ignore the plain and ordinary meaning of the Bond's "only while performing" language, as it was clearly designed to address those situations where a third party vendor performs both traditional loan servicing functions and non-servicing functions so as to limit coverage to only those

16

fraudulent acts committed by the vendor in its loan servicing role.  See Andy Warhol Found. For the Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999) ("[A]n insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meanings of the policy's terms.").

This is particularly evident in light of the fact that the Bond explicitly excludes from its definition of "employee" independent contractors and agents, thereby excluding coverage under Coverage A for any losses directly resulting from the kind of dishonest acts at issue here. Indeed, as CUMIS astutely points out, "there is no question that had CU National been hired only to sell loans on the secondary market (and not to perform and servicing functions), then there would be no coverage for CU National's fraud in selling the subject loans.  The fact that CU National wore multiple hats does not change this result."  (Dkt. No. 91, pg. 13-14.)

This Court finds the holding in North Jersey Sav. and Loan Ass'n v. Fidelity and Deposit Co. of Maryland, 283 N.J. Super. 56 (N.J. Super. 1993), particularly instructive.  The North Jersey case involved a dispute between the plaintiff bank and the defendant surety over coverage under a fidelity bond for losses resulting from the dishonest conduct of Landbank, which performed both loan servicing and non-loan servicing functions for the plaintiff bank.  The rider of the fidelity bond at issue in North Jersey also provided coverage for the fraudulent acts of servicing contractors and contained similar language with respect to the definition of a "servicing contract" as the bond at issue here as follows:

> A "servicing contractor" is a person, partnership or corporation authorized by the insured to collect and receive payments on real estate, mortgage or home-improvement loans held or assigned to the insured, to establish tax and insurance escrow accounts, and to perform other directly related act, "but only while such natural person, partnership or corporation is actually performing such services. . . ."

17

Id. at 71.  The plaintiff bank in North Jersey advanced similar arguments as Suffolk does in the instant case, asserting that "once Landbank became a servicing contractor, its fraud or dishonest is covered by the bond in whatever capacity it was engaged when the dishonest act committed," but the North Jersey Court rejected these arguments.  Id. at 71-72.  It held:

> To interpret this bond as expansively as [the plaintiff bank] contends, is to ignore the unambiguous definition of a "servicing contractor" and particularly the subordinate clause of the definition.  The Rider amends the bond by adding to it an undertaking to provide coverage for the dishonest and fraudulent conduct of a "servicing contractor."  The definition of "servicing contractor" restricts that coverage to a servicing contractor "while actually performing such services. . . ."  This clause clearly and unambiguously limits coverage for the defaults of a servicing contractor to those instances in which the servicing contractor is actually collecting monies, recording the collections, and performing related acts. The language does not permit an interpretation that the Rider covers the conduct of a servicing contractor when it is performing services of some other kind or acting in some other capacity--even in the same transaction.

Id. at 73.  Therefore, because Landbank's "fraud and dishonesty relate[d] to [its] conduct as originator and packager of the mortgages, as distinguished from its conduct as a servicing contractor," the North Jersey Court determined that there was no coverage for the plaintiff bank's losses.  Id. at 72-73.

This Court finds the North Jersey decision persuasive and applies its reasoning here.  As such, this Court grants summary judgment in favor of CUMIS on this issue and holds, as a matter of law, that the Bond's language unambiguously excludes coverage for the dishonest acts committed by CU National when it sold the loans to Fannie Mae, as the selling of loans falls outside the traditional loan servicing functions specifically enumerated under the Bond's definition of "servicing contractor."

In addition, the Court declines to adopt Suffolk's strained interpretation of subsection (c) of the definition of "servicing contractor," which states that a third party vendor is a "servicing contractor" while "manag[ing] real property owned by [Suffolk] or under [Suffolk's] supervision or control." (Dkt. No. 83-1, pg. 52.) As an initial matter, it appears that Suffolk never raised this new theory in its pleadings, and is thus, precluded from raising it for the first time in its summary judgment motion. See Arch Ins. Co. v. Percision Stone, Inc., 584 F.3d 33, 42 (2d Cir. 2009). Nevertheless, this Court finds that the plain and ordinary meaning of subsection (c) cannot be read to include "interests in real property," as Suffolk argues, and that such a reading would merely "superimpose an unnatural and unreasonable construction" upon the language of the Bond. Maurice Goldman & Sons v. Hanover Ins. Co., 592 N.Y.S.2d 645, 645, 607 N.E.2d 792, 792, 80 N.Y.2d 986, 987 (1992).

However, relying on the Second Circuit's opinion in FDIC v. National Union, 205 F.3d 66 (2d. Cir. 2000), Suffolk also argues that even if CU National was not a servicing contractor when it sold the bonds to Fannie Mae, coverage under Coverage A is still available because CU National concealed the fraud while performing the three enumerated traditional loan servicing functions. In this regard, Suffolk claims that

> CU National specifically used the function of "[c]ollect[ing] and record[ing] payments on real estate mortgage . . . loans," as laid out in subsection (a) of the "servicing contractor" definition, to commit fraud. Specifically, because CU National was already responsible for collecting legitimate mortgage payments from borrowers on Suffolk's behalf, recording those payments for Suffolk, and remitting the proceeds to Suffolk, it was able to conceal the fact that it had stolen 189 loans from Suffolk by dishonestly performing those very services – collecting and recording false borrower payments, fabricating false trial balances, and remitting false borrower payments to Suffolk on loans it no longer owned.

(Dkt. No. 84, pg. 18.)  See <u>FDIC</u>, 205 F.3d at 76 ("A loss is directly caused by the dishonest or fraudulent act within the meaning of the Bond where the bank can demonstrate that it would not have made the loan in the absence of the fraud.") (quoting <u>First Nat'l Bank of Louisville v. Lustig</u>, 961 F.2d 1162, 1167 (5th Cir. 1992)).  On the other hand, CUMIS alleges that coverage is still not available under Coverage A because Suffolk's loss did not "result[] directly from" CU National's concealment, as required by the Bond.  (Dkt. No. 91, pg. 20.)

As mentioned above, Coverage A, Employee or Director Dishonesty, provides coverage "for [] loss resulting directly from dishonest acts committed by an 'employee' or 'director,' acting alone or in collusion with others."  (Dkt. No. 83-1, pg. 25.)  "By expressly referring to loss resulting *directly* from employee dishonesty," the plain and ordinary meaning of the Bond suggests that CUMIS "does not insure against consequential or remote damages that might arise out of the employee's conduct."  <u>Finkel v. St. Paul Fire & Marine Ins. Co.</u>, 3:00cv1194 (AHN), 2002 U.S. Dist. LEXIS 11581, at *14 (D. Conn. June 6, 2002) (emphasis in original).

Although the Court has found, as a matter of law, that no coverage is available for any of Suffolk's losses resulting directly from CU National's fraudulent conduct in selling the subject loans, the Court believes that the parties have raised triable issues of fact with respect to whether any of Suffolk's losses resulted directly from CU National's acts of concealment, which were committed while CU National was performing the enumerated traditional loan servicing functions.  Specifically, issues of fact exist as to (1) whether CU National had the requisite intent under the Bond when it committed the concealment; (2) whether and to what extent Suffolk relied on the fraudulent reports generated by CU National in continuing to retain CU National; and (3) whether these reports contained any red flags that would have alerted Suffolk to CU National's fraudulent scheme.  See <u>U.S. Alliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.</u>,

03 Civ. 10317 (PGG), 2009 U.S. Dist. LEXIS 83047, at *38 (S.D.N.Y. Sept. 10, 2009).

Therefore, the Court declines to grant summary judgment on this issue.

**D.  As to Whether Suffolk's Losses are Covered Under Coverage S, Forgery and Alteration**

In the event that no coverage is available under Coverage A, Suffolk also seeks coverage under Coverage S, Forgery and Alteration.  In its Complaint, Suffolk claimed that it was entitled to coverage under Coverage S "for each real estate loan lost by Suffolk as a result of the forgery of promissory notes or other mortgage-related documentation by CU National and/or CU National's officers, directors or employees[.]"  (Dkt. No. 1, ¶ 50(c).)  However, it appears that Suffolk has now abandoned its forgery theory in favor of an alteration theory.

As stated above, a party is precluded from raising a new theory on a motion for summary judgment that has not been raised in the pleadings.  See Arch Ins. Co., 584 F.3d at 42.  Yet, even if this Court were to consider this theory, it would find it unavailing.

Although the term "alteration" is undefined in the Bond, "[i]t is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  Fed. Ins. Co., 639 F.3d at 567 (citation and internal alterations omitted). The plain and ordinary meaning of "alteration" is "the act or process of altering." Alteration Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/alteration (last visited Dec. 7, 2012).  "Alter" means "to make different without changing into something else." Alter Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/alter (last visited Dec. 7, 2012).

The Court finds that, in this context, "[a]lteration presupposes a genuine instrument that has been fraudulently changed."  Charter Bank Northwest v. Evanston Ins. Co., 791 F.2d 379, 383 (5th Cir. 1986).  As a result, when the instruments in question "were fraudulent from their

inception," they cannot be said to be "'altered' within the meaning of the bond." <u>Id.</u>  Moreover,

while "creative arguments might be advanced as to why the term 'altered' should be read in this

situation other than according to its commonly understood meaning," this Court "decline[s] to

pursue them." <u>Id.</u>

In this case, it is undisputed that CU National effectuated the fraudulent scheme by

fabricating new Allonges and Assignments, not by altering pre-existing ones.  The creation of

counterfeit Allonges and Assignments by CU National from the whole cloth clearly does not

constitute an "alteration" under the language of Coverage S.  Further, the Court notes that

coverage is also not available under a forgery theory, since the Bond states that "a signature that

consists in whole or in part of one's own name signed with or without authority, in any capacity

for any purpose, is not a 'forgery'" and it is undisputed that McGrath and his employees signed

their own names on the falsified Allonges and Assignments.  (Dkt. No. 83-1, pg. 48.)  As such,

Suffolk is precluded from coverage under Coverage S as a matter of law.

**E.  As to Whether Suffolk Knew of the Fraud Before it Was Contacted by U.S. Attorney's Office in January 2009**

By its terms, the "Bond applies to loss discovered by you while this Bond is in effect."

(Dkt. No. 83-1, pg. 71.)    Further, the Bond states that "[d]iscovery occurs when you first

become aware of facts which would cause a reasonable person to assume that a loss of a type

covered under this bond has been or will be incurred, regardless of when the act or acts causing

or contributing to such loss occurred."  (Dkt. No. 83-1, pg. 71.)

CUMIS contends that Suffolk discovered the loss as early as June 2006 because of "the

significant red flags with the improper identification of loans to be sold or serviced, the delays in

remitting both monthly servicing monies and sales proceeds, along with Suffolk's knowledge

that it was not fully protected because of its failure to comply with financial regulations requiring audit of CU National[.]" (Dkt. No. 91, pg. 11.) As a consequence, according to CUMIS, Suffolk is not covered under the Bond since it discovered the loss prior to the Bond's inception. However, Suffolk maintains that it did not discover the loss until the U.S. Attorney Office notified it of McGrath's fraud in January 2009.

The Court finds that triable issues of fact exist with respect to when Suffolk discovered the loss. In this regard, the parties dispute when and whether Suffolk "[became] aware of facts which would cause a reasonable person to assume that a loss of a type covered under [the] Bond had been or will be incurred" prior to January 2009. (Dkt. No.83-1, pg. 71.) Accordingly, this is not an appropriate issue for summary judgment. See St. Lawrence County Nat'l Bank v. American Motorists Ins. Co., 249 N.Y.S.2d 543, 545, 21 A.D.2d 702, 703 (3d Dept.1964).

**F. As to Whether Suffolk's Losses Constitute a "Single Loss" Under the Bond**

Under the Bond, "single loss" is defined as either "a. [a]ny one act or omission, or series of related acts and/or omissions, on the part of any person or persons . . . whenever occurring" or "b. [a]ll acts and omissions, whether related or not, on the part of any person . . . or in which such person is concerned or implicated, whenever occurring[.]" (Dkt. No. 83-1, pg. 52.) As abovementioned, the single loss limit of liability for Coverage A is $10 million, subject to a single loss deductible of $25,000.

Suffolk asserts that the single loss limit of liability should not apply in this case. According to Suffolk, CUMIS has not "established that all of the acts were committed by the same person, or that all of the co-conspirators' actions were attributable to McGrath" so that subsection (b) of the Bond's "single loss" definition does not apply. (Dkt. No. 90-7, pg. 16.) Suffolk also argues that subsection (a) of the Bond's "single loss" definition is inapplicable to

this case, because CUMIS has failed to demonstrate "that Suffolk's losses resulted from a series of related acts" of McGrath and his co-conspirators."  (Dkt. No. 90-7, pg. 18.)

However, the undisputed facts establish that Suffolk's losses do, in fact, constitute a "single loss" under the Bond as a matter of law.  In particular, subsection (b) of the Bond's "single loss" definition is clearly applicable to the instant action, as it was the fraudulent conduct of McGrath that led to Suffolk's losses.  Indeed, Suffolk even admits in its own Memorandum of Law for Partial Summary Judgment that "from 2004 to January 2009, McGrath, and others at CU National and USM *acting under McGrath's direction and control*, sold 189 of Suffolk's mortgages (worth over $42 million) to the Federal National Mortgage Association ("Fannie Mae") without Suffolk's knowledge or authorization." (Dkt. No. 84, pg. 3, emphasis added.)  It is only when confronted with CUMIS's motion for summary judgment on this issue that Suffolk tries to argue otherwise.  Yet, the evidence is clear that even if McGrath did not sell each of the 189 loans to Fannie Mae himself, he was certainly at least "concerned or implicated" in his employees dishonest actions.

As McGrath clearly orchestrated the entire fraudulent scheme, the single loss limit of liability limit must be applied to Suffolk's coverage claim under subsection (b) of the Bond.  See Cumberland Packing Corp. v. Chubb Ins. Corp., 6690/10, 29 Misc.3d 1208A (N.Y. Sup. Ct. 2010) (holding that where "all of the losses resulted from [a single Employee's acts]," it "constitute[s] a single loss.").   In addition, the Court notes that the single loss limit of liability limit also applies in this case through subsection (a) of the "single loss" definition, since the fraudulent scheme consisted of a "series of related acts" – that is, the fraudulent sales of the subject loans to Fannie Mae – by McGrath and his employees at CU National and U.S. Mortgage.

Further, Suffolk's reliance on <u>Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.</u> 854 A.2d 378 (N.J. 2004), in this regard is misplaced.  The insurance policy language in that case involved the definition of a "single occurrence," not the definition of a "single loss" and differed significantly from the Bond language at issue here.  <u>Id.</u> at 274-75.  Accordingly, the <u>Gentilini</u> decision is not controlling in this case.  Here, the Court is bound to adhere to the plain and ordinary meaning of the language of the Bond.  <u>Fed. Ins. Co.</u>, 639 F.3d at 567

As a final matter, since the single loss limit of liability of $10 million, subject to a $25,000 deduction, applies as a matter of law, this Court need not reach the issues raised by CUMIS and Suffolk with respect to the appropriate way to calculate Suffolk's losses, as both parties agree that Suffolk's losses are greater than $10 million.

**G. As to Whether Suffolk is Entitled to an Award of Attorneys' Fees**

In the context of insurance contract disputes,

> [i]t is well settled in New York that a prevailing party may not recover attorneys' fees from the losing party except where authorized by statute, agreement or court rule. However, an insured who is cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations, and who prevails on the merits, may recover attorneys' fees incurred in defending against the insurer's action. The reasoning behind [this rule] . . . is that an insurer's duty to defend an insured extends to the defense of any action arising out of the occurrence, including a defense against an insurer's declaratory judgment action.

<u>U.S. Underwriters Ins. Co. v. City Club Hotel, LLC</u>, 3 N.Y.3d 592, 597-598, 822 N.E.2d 777, 779-80, 789 N.Y.S.2d 470, 472-73 (2004) (citations and internal quotation marks omitted).  <u>See also</u> <u>Mighty Midgets, Inc. v. Centennial Ins. Co.</u>, 47 N.Y.2d 12, 21, 389 N.E.2d 1080, 1085; 416 N.Y.S.2d 559, 564 (1979) ("It is the rule in New York that [a recovery for attorneys' fees and legal expenses] may not be had in an affirmative action brought by an assured to settle its rights,

but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations.") (citations omitted).  In both U.S. Underwriters and Mighty Midgets, the insurer brought a declaratory judgment action against the insured.

The facts in this case do not give rise to the narrow exception allowing recovery for attorneys' fees.  CUMIS has not brought a declaratory judgment action against Suffolk in order to free itself from its obligations under the Bond.  Indeed, Suffolk initiated this action against CUMIS and thus, CUMIS, not Suffolk, is cast in a defensive posture.  As such, Suffolk is not entitled to recover attorneys' fees in this case.

## IV.  SUFFOLK'S MOTION TO AMEND ITS COMPLAINT

### A. Legal Standard

A motion to amend is governed by Fed. R. Civ. P. 15(a), which states that leave to amend "shall be freely given when justice so requires."  "Leave to amend should be denied only because of undue delay, bad faith, futility, or prejudice to the non-moving party, and the decision to grant or deny a motion to amend rests within the sound discretion of the district court."  DeFazio v. Wallis, 05-CV-5712 (ADS)(ARL), 2006 U.S. Dist. LEXIS 95154, at *4 (E.D.N.Y. Dec. 9, 2006) (citing Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603-04 (2d Cir.2005); Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995)).  A proposed amendment is futile if the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss.  Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002).

In this case, Suffolk moves to amend the Complaint to add a claim against CUMIS for its alleged bad faith denial of coverage and to seek a claim for its attorneys' fees on this ground.  In support of its motion, Suffolk relies on the New York Court of Appeals' decision in Sukup v. State, 19 N.Y.2d 519, 227 N.ER.2d 842 (1967), in which the court held that an insured may

"recover his legal expenses in a controversy with a carrier over coverage" only when there was "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." Id. at 522. According to Suffolk, CUMIS has acted in bad faith because it has advanced the same arguments in this case that it did in the Sperry action, even though the Sperry court not only rejected these arguments, but found in favor of the plaintiff credit union on its bad faith claim.

However, in light of this Court's ruling on the parties' summary judgment motions and the fact that this Court declined to accept the Sperry Court's approach with respect to interpreting the Bond's definition of "servicing contractor," such a claim for bad faith would be futile. See Lyons Fed. Sav. & Loan v. St. Paul Fire & Marine Ins. Co., 863 F. Supp. 1441, 1449 (D. Kan. 1994) ("Because this court has found St. Paul properly denied coverage on Lyons' claims, there can be no viable claim that St. Paul acted in bad faith."). Accordingly, the Court denies Suffolk's motion to amend the Complaint.

## V. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that CUMIS's motion to strike Suffolk's second motion for partial summary judgment is denied; and it is further

**ORDERED** that Suffolk's motion to strike CUMIS's May 23, 2012 and June 22, 2012 Rule 56.1 Statements is denied; and it is further

**ORDERED** that Suffolk's motion to amend the Complaint is denied; and it is further

**ORDERED** that Suffolk's motions for partial summary judgment are denied; and it is further

**ORDERED** that CUMIS's motion for summary judgment is granted in part and denied in part.  The Court finds as a matter of law that (1) Suffolk is not entitled to coverage under Coverage A, Employee or Director Dishonesty, for acts committed by CU National outside the scope of the three enumerated traditional loan service functions listed under the Bond's definition of "servicing contractor"; (2) Suffolk is not entitled to coverage under Coverage S, Forgery and Alteration; (3) the Bond's "Single Loss Limit of Liability" condition applies, and thus, if Suffolk prevails, CUMIS is only liable for $10 million, subject to a $25,000 deduction; and (4) Suffolk is not entitled to recover attorneys' fees.  The Court finds that triable issues of fact remain as to (1) the Bond's "Discovery of Loss" condition and (2) whether Suffolk's losses resulted directly from the fraudulent acts committed by CU National while performing its servicing functions.   As it undisputed that Suffolk's losses from the CU National fraud are greater than $10 million, the Court does need not reach the question of the appropriate manner of calculating Suffolk's losses.

**SO ORDERED.**

Dated: Central Islip, New York
December 15, 2012

                                      ____*/s/ Arthur D. Spatt*____
                                        ARTHUR D. SPATT
                                        United States District Judge